## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| Maria Rice, Gerald Smith, and Usha Rafferty, individually and on behalf of all others similarly situated, | ) ) ) |
| | ) |
| *Plaintiffs* | ) |
| | ) |
| v. | ) Case No. |
| | ) |
| Southwest Energy, L.P., Symmetry Energy Solutions, LLC, and John Does 1-5 | ) ) ) |
| | ) |
| *Defendants* | ) |
| | ) |

## CLASS-ACTION COMPLAINT

Plaintiffs, Maria Rice, Gerald Smith, and Usha Rafferty, individually and on behalf of a class of similarly situated residents of Kansas (the Atmos residential class), bring this class action under the Kansas Consumer Protection Act (KCPA)[1] against Defendants, Southwest Energy, L.P., Symmetry Energy Solutions, LLC, and John Does 1-5.

### Introduction

1.      Among other prohibitions, the KCPA makes it unlawful for suppliers to: (1) induce consumers into transactions that are excessively one-sided; or (2) profiteer from a disaster.

2.      In February 2021, Winter Storm Uri brought sustained and extreme cold weather to Kansas, causing Governor Laura Kelly to proclaim a state of disaster.

3.      At the same time, Defendants—suppliers of natural gas to Kansas natural-gas distributors—charged prices that exceeded more than 100 times, and on one day, more than 200 times, the price of natural gas before Winter Storm Uri hit the State of Kansas.

---

[1] *See* K.S.A. 50-623, *et seq.*; K.S.A. 50-6,106.

4.    Plaintiffs accordingly bring these claims to recover damages as a result of Defendants' unconscionable practices.

## Parties

5.    Plaintiff, Maria Rice, is a Kansas citizen who is domiciled and intends to remain living in Lenexa, Kansas and is a Kansas consumer, as that term is defined in the KCPA. Ms. Rice buys and uses the natural gas that Defendants produce and supply to Atmos Energy Corporation (Atmos) for personal, family, and household needs, including home heating.

6.    Plaintiff, Gerald Smith, is a Kansas citizen who is domiciled and intends to remain living in Basehor, Kansas and is a Kansas consumer, as that term is defined in the KCPA. Mr. Smith buys and uses the natural gas that Defendants produce and supply to Atmos for personal, family, and household needs, including home heating.

7.    Plaintiff, Usha Rafferty, is a Kansas citizen who is domiciled and intends to remain living in Olathe, Kansas and is a Kansas consumer, as that term is defined in the KCPA. Ms. Rafferty buys and uses the natural gas that Defendants produce and supply to Atmos for personal, family, and household needs, including home heating.

8.    Defendant Southwest Energy, L.P., is a limited partnership organized in Delaware with its principal place of business in Texas. At all relevant times, Southwest Energy produced or supplied natural gas to Plaintiffs through Atmos. Southwest Energy was aware that the natural gas it sold to Atmos was primarily used to service the residential consumer market in Kansas.

9.    Defendant Symmetry Energy Solutions, LLC, is a Delaware limited liability company with its principal place of business in Texas. At all relevant times, Symmetry acted as an asset manager for Atmos and handled Atmos's natural-gas supply and scheduling needs. Symmetry was aware that most of Atmos's customers in Kansas were residential consumers.

10.     Defendant John Doe 1 was Atmos's most significant natural-gas supplier in February 2021 and is one of the largest wholesale gas suppliers in the country. On information and belief, John Doe 1's principal place of business is not in Kansas. At all relevant times, John Doe 1 was aware that the natural gas that it sold to Atmos through Symmetry was primarily used to service the residential consumer market in Kansas.

11.     Defendants John Does 2-5 are suppliers of natural gas to Atmos, for whom Symmetry contracted to supply natural gas. At all relevant times, John Does 2-5 were aware that the natural gas they sold to Atmos through Symmetry was primarily used to service the residential consumer market in Kansas. Plaintiffs have attempted to obtain the identities of John Does 2-5 from Symmetry. Though other distributors in Kansas have publicly disclosed their natural-gas suppliers during Winter Storm Uri,[2] Symmetry has not.

## Jurisdiction & Venue

12.     This Court has jurisdiction over plaintiffs' claims under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the matter in controversy exceeds the sum of $5,000,000 and is a class action in which a member of a class of plaintiffs is citizen of a State different from a defendant.

---

[2] *See* Supp. Testimony & Ex. Of Kent J. Kopetzky, *In the Matter of the Investigation into Black Hills/Kansas Gas Utility Company, LLC, d/b/a Black Hills Energy, Regarding the February 2021 Winter Weather Events as Contemplated by Docket No. 21-GIMX-303-MIS*, Docket No. 21-BHCG-334-GIG, Supp. Ex. KJK-1 (Kan. Corp. Comm'n Jan. 4, 2024) (Black Hills suppliers); Second Am. to Not. of Providing Certain Redacted Contracts of Kan. Gas Serv., *In the Matter of the Application of Kansas Gas Service, a Division of ONE Gas, Inc., Regarding February 2021 Winter Weather Events, as Contemplated by Docket No. 21-GIMX-303-MIS*, Dkt. No. 21-KGSG-332-GIG (Kan. Corp. Comm'n Nov. 8, 2021) (Kansas Gas Service suppliers); Removal of Confidential Designation on Names of Suppliers, *In the Matter of the Investigation Into Atmos Energy Corporation Regarding February 2021 Winter Weather Events, as Contemplated by Docket No. GIMX-303-MIS*, Dkt. No. 21-ATMG-333-GIG at 2 (Kan. Corp. Comm'n Jan. 2, 2024) (Atmos Suppliers, including Symmetry).

13.     This Court has personal jurisdiction over the defendants in this case because they engaged in sales of natural gas to Atmos, who distributes and sells natural gas to Kansas consumers. For the same reason, venue is appropriate in the District of Kansas.

## General Allegations

### *The Natural Gas Market*

14.     Natural gas goes through three basic steps to reach retail users' and consumers' homes. First, natural-gas producers and suppliers drill wells to pump natural gas out of the ground to process and deliver natural gas to interstate pipelines. Second, interstate pipelines ship the gas from oil and gas fields to various cities and distribution points. Third, and finally, local distributors bring the gas from the pipelines and resell it to businesses and residential customers within their markets.

15.     Most producers and marketers of natural gas tie the price that they charge for natural gas to S&P Global's Platts market index (Platts). Platts is a price-reporting agency that, among thing things, collects data on natural-gas trades and publishes both daily and monthly price indexes for various trading locations for natural gas.

16.     Though Platts verifies the information that traders report, reporting to Platts is voluntary. As a result, the number of trades that Platts verifies and relies on to establish its index prices does not represent all the actual natural-gas trades that occur on any given day.

17.     Local distributors generally acquire needed supplies of natural gas at three purchasing levels that reflect historic temperature levels and the length of time that cold weather may persist.

18.      The first level is "base load" natural gas, which reflects historical natural-gas usage. A contract for base load gas is often negotiated in the summer so natural gas can be scheduled for both storage and for delivery when natural-gas usage is high. The price for base load volumes is typically tied to a "first of the month" (FOM) price survey as published in the Platts Inside FERC Gas Market Report. Platts determines the monthly price by calculating a volume-weighted average of all transactions submitted to Platts during the last three trading days of the previous month. Base load volumes are reserved for purchase by both the supplier and the purchaser.

19.      The second level of natural-gas supply is "callable" natural gas. At this level, suppliers and distributors commit to reserve additional volumes of natural gas above the base load volumes and let distributors call additional natural gas if the seasonal use is higher than historical usage levels. Suppliers often charge to reserve callable volumes that may not be purchased, depending on whether the temperature is colder than historical levels. Callable volumes are typically priced before distributors call them for purchase at the daily trading price reflected in "Gas Daily," or daily index price, on the day the volumes are called for purchase. "Gas Daily" is a trade publication of Platts Gas Daily.

20.      The third level of natural-gas supply is "spot" natural gas. Spot gas is a volume of natural gas that reflects the need for gas above both the base load and callable volumes. Spot volumes of natural gas are typically contracted for at the time or near the time of use, and the price is typically negotiated to reflect a premium above the Gas Daily price for the day of use.

21.     Platts calculates the daily index by reviewing each day's reported, qualifying trades for next-day delivery and calculating the volume-weighted average price of those transactions. When Platts reports the daily, "spot" price, it reports: (1) the midpoint; (2) the common range; and (3) the absolute range of reported transactions.[3] Most spot purchases are tied to the midpoint.

22.     Platts does not update its daily index price on weekends or holidays. Thus, if a holiday falls on a Monday, the Platts index remains the same through the weekend and holiday.[4]

23.     Platts calculates the daily index by reviewing each day's reported, qualifying trades for next-day delivery and calculating the volume-weighted average price of those transactions. When Platts reports the daily, "spot" price, it reports: (1) the midpoint; (2) the common range; and (3) the absolute range of reported transactions.[5] Most spot purchases are tied to the midpoint.

24.     Platts does not update its daily index price on weekends or holidays. Thus, if a holiday falls on a Monday, the Platts index remains the same through the weekend and holiday.[6]

25.     Platts' index pricing is also location specific. Relevant here, the majority of Atmos's gas purchases are based on two Platts index locations: (1) the Southern Star Central Gas Pipeline (Southern Star); and (2) Panhandle Eastern (together, the Atmos Indexes).

***Atmos***

26.     Atmos markets itself as the country's largest natural gas-only distributor that delivers natural gas to more than 3 million customers in 8 states.

---

[3] *See* S&P Global Platts, *Methodology and Specifications Guide: US & Canada Natural Gas* 4 (2023), *available at* https://www.spglobal.com/commodityinsights/plattscontent/_assets/_files/en/our-methodology/methodology-specifications/na_gas_methodology.pdf.

[4] *See id.*

[5] *See* S&P Global Platts, *Methodology and Specifications Guide: US & Canada Natural Gas* 4 (2023), *available at* https://www.spglobal.com/commodityinsights/plattscontent/_assets/_files/en/our-methodology/methodology-specifications/na_gas_methodology.pdf.

[6] *See id.*

27.     Atmos reported in September 2021 that it was distributing natural gas to a customer base in Kansas that included 125,000 Kansas residential customers.[7]

28.     To do so, Atmos relied primarily on an asset manager, but also entered standard supply agreements with natural-gas marketers. Atmos's standard supply agreements obligated its counterparties to sell natural gas to Atmos at index-based prices, including on the Atmos Indexes.[8]

29.     In February 2021, Symmetry was Atmos's asset manager and had been for nearly ten years. As Atmos's asset manager, Symmetry was generally responsible for Atmos's "supply and scheduling needs," among other responsibilities.[9] When Symmetry acquires natural gas for Atmos, it typically buys that gas based an index price or at a fixed price in advance.[10]

30.     Atmos passes the cost of the natural gas that it acquires from its suppliers on to its customers, including its residential customers.

### *Winter Storm Uri*

31.     On February 1, 2021, Platts FOM prices for the Atmos Indexes were:

    a.  Southern Star: $2.545; and

    b.  Panhandle Eastern: $2.550.

---

[7] Direct Testimony of Barton W. Armstrong, *In the Matter of the Investigation Into Atmos Energy Corporation Regarding February 2021 Winter Weather Events, as Contemplated by Docket No. GIMX-303-MIS*, Dkt. No. 21-ATMG-333-GIG, at 5 (Kan. Corp. Comm'n, Sept. 14, 2021).

[8] Direct Testimony of Kenneth M. Malter, *In the Matter of the Investigation Into Atmos Energy Corporation Regarding February 2021 Winter Weather Events, as Contemplated by Docket No. GIMX-303-MIS*, Dkt. No. 21-ATMG-333-GIG, at 10 (Kan. Corp. Comm'n, Sept. 14, 2021) (hereinafter Malter Testimony)

[9] Testimony of William Casey Lee, *In the Matter of the Application of Kansas Gas Service, A Division of One Gas, Inc. Regarding February 2021 Events, as Contemplated by Docket No. 21-GIMX-303-MIS*, Dkt. No. 21-KGSG-332-GIG, at 16 (Kan. Corp. Comm'n, Dec. 21, 2021) (hereinafter Lee Testimony).

[10] *Id.* at 14.

32.    Around February 3, 2021, Kansas regional weather reports began predicting colder weather through February 20, and the spot price for natural gas made modest increases. For example, by February 6, the spot price for natural gas at the Southern Star location had risen from $2.520 to $3.560 MMBtu. By February 9, the spot price rose slightly higher to $3.655 MMBtu.

33.    Around the same time, Winter Storm Uri approached and temperatures in Kansas started to deviate substantially from their historical averages. In Wichita, Kansas, for example, the National Weather Service reported the following daily average temperatures and their departure from historical averages:

| Date | Daily Average Temperature (Wichita, KS) | Historical Average (Wichita, KS) | Departure From Historical Average (Wichita, KS) |
|---|---|---|---|
| 2/6/2021 Saturday | 26 | 35 | -9 |
| 2/7/2021 Sunday | 16 | 35 | -19 |
| 2/8/2021 Monday | 13 | 35 | -22 |
| 2/9/2021 Tuesday | 12 | 35 | -23 |

34.    In the same timeframe, the Atmos Indexes held steady:

| Date | Southern Star | Panhandle Eastern |
|---|---|---|
| 2/6/2021 Saturday | $3.560 | $3.515 |
| 2/7/2021 Sunday | $3.560 | $3.515 |
| 2/8/2021 Monday | $3.560 | $3.515 |
| 2/9/2021 Tuesday | $3.655 | $3.525 |

35.     From Wednesday, February 10, 2021, through Saturday, February 13, as cold temperatures continued to deviate from there historical norms:

| Date | Daily Average Temperature (Wichita, KS) | Historical Average (Wichita, KS) | Departure From Historical Average (Wichita, KS) |
|---|---|---|---|
| 2/10/2021 Wednesday | 14 | 36 | -22 |
| 2/11/2021 Thursday | 14 | 36 | -22 |
| 2/12/2021 Friday | 7 | 36 | -29 |
| 2/13/2021 Saturday | 8 | 36 | -28 |

36.     At this point, however, the Atmos indexes skyrocketed:

| Date | Southern Star | Panhandle Eastern |
|---|---|---|
| 2/10/2021 Wednesday | $4.030 | $3.675 |
| 2/11/2021 Thursday | $9.620 | $6.310 |
| 2/12/2021 Friday | $44.780 | $14.545 |
| 2/13/2021 Saturday | **$329.595** | **$224.560** |

37.     Notably, Platts' February 13 spot price of $329.595 at the Southern Star location was based on just seven trades for 50,000 MMBtu. Those seven trades represented just 2% of the overall volume of natural gas that flowed on the Southern Star pipeline in the same timeframe.

38.     In the meantime, on February 12, 2021, Governor Kelly issued an executive order that recognized the "severe winter cold" in Kansas and that the cold temperatures had become a "disaster."[11]

39.     Two days later, on February 14, 2021, Governor Kelly declared a state of emergency over the sustained and extreme cold weather that Kansans were facing, stating that "[l]ow temperatures with sub-zero wind chills *over the past several days* accompanied by snow, sleet, and freezing rain across the state have caused stress on energy infrastructure."[12]

40.     The next day, the Kansas Corporation Commission (KCC) entered an order directing all jurisdictional natural-gas utilities "to do all things possible and necessary to ensure natural gas . . . services continue to be provided to their customers in the State."[13]

41.     In response, natural-gas distributors in Kansas, including Atmos, made substantial purchases of natural gas at the prevailing spot price to ensure their storages of natural gas would not run low.

---

[11] Exec. Order 21-03, *Conditional and Temporary Relief from Certain Motor Carrier Rules and Regulations*, Kansas Governor's Office (Feb. 12, 2021), *available at* https://governor.kansas.gov/wp-content/uploads/2021/02/21-03-Motor-Carrier-Relief-.pdf.

[12] *See* Kansas Executive Department, *State of Disaster Emergency Proclamation* (Feb. 14, 2021), *available at* https://governor.kansas.gov/wp-content/uploads/2021/02/2-14-2021-Extreme-Weather-Disaster-Declaration-Executed.pdf (emphasis added).

[13] Emergency Order, *In the Matter of Record Natural Gas Prices and Potential System Reliability Issues from Unprecedented and Sustained Cold Weather*, Docket No. 21-GIMX-303-MIS, at 3 ¶ B (Kan. Corp. Comm'n, February 15, 2021).

42.    From February 14 to 16, temperatures remained historically low:

| Date | Daily Average Temperature (Wichita, KS) | Historical Average | Departure From Historical Average (Wichita, KS) |
|---|---|---|---|
| 2/14/2021 Sunday | -1 | 37 | -38 |
| 2/15/2021 Monday | -5 | 37 | -42 |
| 2/16/2021 Tuesday | -3 | 37 | -40 |

43.    However, February 13, 2021, was a Saturday; February 14, 2021, was a Sunday; and the following Monday, February 15, 2021, was President's Day, a federal holiday. As a result, as temperatures departed even more substantially from their historical averages, Platts' spot price of natural gas stayed historically high:

| Date | Southern Star | Panhandle Eastern |
|---|---|---|
| 2/14/2021 Sunday | $329.595 | $224.560 |
| 2/15/2021 Monday | $329.595 | $224.560 |
| 2/16/2021 Tuesday | $329.595 | $224.560 |

44.    By comparison, the S&P Global Platts – Gas Daily reported that the national average for natural gas was $57.74.

45.    Further, despite increasing demand for natural gas, the Platts index for the Southern Star location between February 13-16, 2021, was based on a mere seven qualifying trades on February 12, 2021 for a total of 50,000 MMBtu.

11

46.     On Wednesday, February 17, 2021, cold temperatures began to show some signs of easing in Kansas:

| Date | Daily Average Temperature (Wichita, KS) | Historical Average (Wichita, KS) | Departure From Historical Average (Wichita, KS) |
|---|---|---|---|
| 2/17/2021 Wednesday | 16 | 38 | -22 |
| 2/18/2021 Thursday | 17 | 38 | -21 |

47.     Nonetheless, Platts' spot pricing for the same days includes an astronomic $622.785/MMBtu spot price for natural gas at the Southern Star location:

| Date | Southern Star | Panhandle Eastern |
|---|---|---|
| 2/17/2021 Wednesday | **$622.785** | $129.385 |
| 2/18/2021 Thursday | $44.530 | $23.390 |

48.     By comparison, the S&P Global Platts-Gas Daily reported that the national average for natural gas on February 17, 2021, was $79.40.

49.     Notably, as demand for natural gas remained high throughout Winter Storm Uri—necessitating hundreds of actual trades for natural gas—the Platts index spot price for the Southern Star location on February 17, 2021, was based on just two qualifying trades for a total of 16,000 MMBtu. These two trades represented just one half of one percent of the total natural gas that was moving on the Southern Star pipeline in the same timeframe.

50.     The Kansas Attorney General investigated those trades and ultimately brought a lawsuit against Macquarie Energy, LLC, alleging that Macquarie Energy unlawfully manipulated the natural-gas market at the Southern Star location.[14]

51.     Further, as the price for natural gas skyrocketed, natural-gas suppliers throughout the industry: (1) made force-majeure declarations in their existing agreements with distributors to deliver baseload gas; or (2) otherwise cut those supplier's contracted-for baseload supply, to redirect and resell that natural gas to other distributors at the exponentially higher spot price.

52.     For example, in testimony to the KCC, Symmetry catalogued "unprecedented" supplier cuts of Atmos's baseload gas, including "[t]he majority of Symmetry's baseload gas supply" on certain days.[15]

53.     The precise volume of Symmetry's supplier cuts remains redacted in public filings.[16] But Symmetry has identified that on February 15, its "most significant supplier of natural gas for February"—John Doe 1—"notified Symmetry that it would not be able to supply any gas for the rest of the month."[17]

54.     On information and belief, John Does 2-5 also cut the baseload supply of natural gas that they had contracted to provide Atmos through Symmetry and also redirected that gas to the spot market.

55.     The total supply of gas throughout Winter Storm Uri, however, did not significantly change, nor did the Southern Start Central Gas Pipeline ever reach a point where it could not deliver the volume of natural gas that had been nominated by its customer-users or distributors.

---

[14] *See Kansas ex rel. Kobach v. Macquarie Energy, LLC*, No. 23-4116 (D. Kan.).
[15] Lee Testimony at 21-22;
[16] *See id.* at 24-26.
[17] *Id.* at 31.

56.    Rather, natural gas suppliers throughout the industry, including John Doe 1, were systematically cutting distributors' FOM-priced baseload gas and redirecting that gas into the exponentially higher priced spot market in Kansas and elsewhere.

57.    In this case, for example, Atmos incurred more than $5.6 million in natural-gas costs from its purchases of natural gas from the defendant Southwest Energy in February 2021.[18] The vast majority, if not all, of those costs are attributable to natural-gas purchases from Southwest Energy in the spot market. But at the same time that Southwest Energy was selling gas to Symmetry in the spot market, it was cutting substantial volumes of baseload gas that it had otherwise committed to KGS, including 5,000 MMBtu per day between February 14th and 18th.[19]

58.    Given that the overall supply of natural gas in Kansas remained substantially the same throughout Winter Storm Uri, John Doe 1's substantial supply cut to Symmetry on February 15 could only have been made to redirect that baseload gas into the spot market.

59.    On February 19, 2021, temperatures in Kansas returned closer to their historical averages:

---

[18] *See* Removal of Confidential Designation on Names of Suppliers, *In the Matter of the Investigation Into Atmos Energy Corporation Regarding February 2021 Winter Weather Events, as Contemplated by Docket No. GIMX-303-MIS*, Dkt. No. 21-ATMG-333-GIG at 2 (Kan. Corp. Comm'n Jan. 2, 2024).

[19] *See* Removal of Confidential Designation on Names of Suppliers, *In the Matter of the Application of Kansas Gas Service, A Division of One Gas, Inc. Regarding February 2021 Events, as Contemplated by Docket No. 21-GIMX-303-MIS*, Dkt. No. 21-KGSG-332-GIG, at 4-5 (Kan. Corp. Comm'n Jan. 4, 2024) (showing that Southwest Energy cut KGS's supply of baseload natural gas on February 9, 13, 14, 15, 16, 17, 18).

| Date | Daily Average Temperature (Wichita, KS) | Historical Average (Wichita, KS) | Departure From Historical Average (Wichita, KS) |
|---|---|---|---|
| 2/19/2021 Thursday | 21 | 38 | -17 |
| 2/20/2021 Friday | 29 | 39 | -10 |
| 2/21/2021 Saturday | 39 | 39 | 0 |
| 2/22/2021 Sunday | 44 | 39 | 5 |
| 2/23/2021 Monday | 48 | 40 | 8 |

60.    Only then did the Atmos Indexes similarly return to their normal levels:

| Date | Southern Star | Panhandle Eastern |
|---|---|---|
| 2/19/2021 Thursday | $7.945 | $6.265 |
| 2/20/2021 Friday | $4.385 | $4.010 |
| 2/21/2021 Saturday | $4.385 | $4.010 |
| 2/22/2021 Sunday | $4.385 | $4.010 |
| 2/23/2021 Monday | $2.690 | $2.590 |

61.     In testimony to the KCC, a representative of Atmos noted that throughout Winter Storm Uri, Atmos was "not aware of any market participant that would have willingly sold Incremental Gas to [Atmos] at any price less than [the Gas Daily]."[20]

### Residents Bear the Cost of Winter Storm Uri

62.     In the KCC's February 14, 2021, order that directed distributors "to do all things possible and necessary to ensure natural gas . . . services continue" during Winter Storm Uri, the KCC recognized that Kansas natural gas distributors' "costs will eventually flow through to consumers through increases in monthly natural gas and electric bills," and therefore the KCC ordered that "[e]very . . . natural gas distribution utility that incurs extraordinary costs . . . is authorized to defer those costs to a regulatory asset account."[21]

63.     Atmos accordingly deferred the extraordinary costs it incurred during Winter Storm Uri and later sought to securitize those costs through an administrative proceeding.

64.     On March 24, 2022, the KCC approved a settlement agreement with Atmos that allows Atmos to securitize and recover the approximately $102.5 million in extraordinary costs that it incurred as a result of Defendants' pricing during Winter Storm Uri from its retail customers.[22]

---

[20] Malter Testimony at 12.

[21] Emergency Order, *In the Matter of Record Natural Gas Prices and Potential System Reliability Issues from Unprecedented and Sustained Cold Weather*, Docket No. 21-GIMX-303-MIS, at 1 ¶ 1, 3 ¶ C (Kan. Corp. Comm'n, February 15, 2021).

[22] Order Approving Unanimous Settlement Agreement on Atmos Energy Corporation's Financial Plan, *In the Matter of the Investigation into Atmos Energy Corporation Regarding the February 2021 Winter Weather Events, as Contemplated by Docket No. 21-GIMX-303-MIS*, Docket No. 21-ATMG-333-GIG, at 2 ¶ 4, 9-10 (Kan. Corp. Comm'n Mar. 24, 2022).

65.     Of the extraordinary costs that Atmos incurred in buying natural gas during Winter Storm Uri, Atmos testified that 75.015% of that natural gas was used by its residential customers.[23]

66.     By law, qualified extraordinary costs include, among other things, costs "of an extraordinary nature that would cause extreme customer rate impacts if recovered through customary rate-making, including . . . purchase of gas supplies."[24]

67.     The settlement and an accompanying financing order allowed Atmos to recover the approximately $102.5 million in extraordinary costs over a ten-year period.[25] Atmos has reported that "[b]eginning in July [2023], a fixed charge of $6.49 stemming from the securitization of those extraordinary costs will begin appearing on residential customers' monthly bills."[26]

68.     Atmos's settlement agreement with the KCC recognized that Atmos may "receive[] or recover[] . . . payments as a result of subsequent federal or state governmental relief in the form of profit disgorgement, civil suit relief, market manipulation findings, etc." and that Atmos "shall pass those payments on to its customers[.]"[27]

---

[23] *See* Direct Testimony of Kathleen R. Ocanas, *In the Matter of the Investigation Into Atmos Energy Corporation Regarding February 2021 Winter Weather Events, as Contemplated by Docket No. 21-GIMX-303-MIS*, Dkt. No. 21-ATMG-333-GIG, at 5 (Kan. Corp. Comm'n, Sept. 14, 2021).

[24] K.S.A. 66-1,240(b)(18).

[25] *See* Financing Order, *In the Matter of The Application of Atmos Energy Corporation For the Recovery of Qualified Extraordinary Costs and Issuance of a Financing Order*, Docket No. 22-ATMG-538-TAR, at 36 ¶ 29 (Kan. Corp. Comm'n Oct. 25, 2022).

[26] Atmos Energy Corp., *Securitization Charge for Kansas Customers to Appear on Monthly Bills Beginning in July* (June 23, 2023), https://www.atmosenergy.com/news/securitization-charge-kansas-customers-appear-monthly-bills-beginning-july/.

[27] Order Approving Unanimous Settlement Agreement on Atmos Energy Corporation's Financial Plan, *In the Matter of the Investigation into Atmos Energy Corporation Regarding the February 2021 Winter Weather Events, as Contemplated by Docket No. 21-GIMX-303-MIS*, Dkt. No. 21-ATMG-333-GIG, Ex. A at 6 ¶ 13 (Kan. Corp. Comm'n, Mar. 24, 2022).

69.    On January 2, 2024, Atmos disclosed that Southwest Energy charged $5,628,298.46 for natural gas during Winter Storm Uri.[28] Southwest Energy could not have charged Atmos this amount but for the fact that it sold that natural gas at index-based prices.

70.    In the same disclosure, Atmos disclosed that Symmetry charged Atmos $76,354,531.36 for natural gas during Winter Storm Uri.[29] Symmetry could not have charged Atmos this amount but for the fact that it sold that natural gas at index-based prices.

71.    John Doe 1's unprecedented February 15 cut of the baseload gas that Symmetry contracted in advance to purchase caused Symmetry to make substantial purchases of natural gas in the spot market.

72.    On information and belief, John Doe 1 redirected the baseload gas that it contracted to sell Symmetry into the exponentially higher priced spot market, either in Kansas or elsewhere.

73.    After John Doe 1's cut of baseload natural gas to Symmetry, John Does 2-5 seized on Symmetry's immediate need for natural gas and sold natural gas to Symmetry in the spot market at unconscionable index-based prices.

74.    Plaintiffs have attempted to obtain a list of Symmetry's own natural-gas suppliers during Winter Storm Uri, but Symmetry has not disclosed those suppliers. A list of Symmetry's natural-gas suppliers during Winter Storm Uri is otherwise not publicly available.[30]

---

[28] Removal of Confidential Designation on Names of Suppliers, *In the Matter of the Investigation Into Atmos Energy Corporation Regarding February 2021 Winter Weather Events, as Contemplated by Docket No. GIMX-303-MIS*, Dkt. No. 21-ATMG-333-GIG at 2 (Kan. Corp. Comm'n Jan. 2, 2024).

[29] *Id.*

[30] To the extent Symmetry intends to assert a pass-through defense under K.S.A. 50-6,106(b)(1)(C), Plaintiffs ask the Court to require Symmetry to state that defense, including the "proof [Symmetry] incurred such additional costs" within 21 days of service of this complaint.

**Class Allegations**

75.     In addition to bringing these claims on behalf of themselves, Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23 on behalf of a class defined as: all residential customers whose utilities were served by Atmos who must pay for the natural gas Defendants sold through Atmos, between February 10, 2021, and February 18, 2021.

76.     Class certification is appropriate under Federal Rule of Civil Procedure 23(a) and (b)(1), (b)(2), or (b)(3).

77.     The class satisfied the numerosity requirement because it is composed of thousands of persons in numerous cities throughout Kansas.

78.     Atmos has thousands of residential customers, all of which suffered and will continue to suffer from the unconscionable prices that Defendants charged during Winter Storm Uri.

79.     The number of class members is so large that joinder of all its members is impracticable.

80.     There are questions of law and fact common to the class and these questions predominate over questions affecting only individual class members.

81.     Common legal and factual questions include, but are not limited to:

   a.   Whether Defendants supplied natural gas to Atmos during Winter Storm Uri.

   b.   Whether Defendants charged Atmos unconscionable prices during Winter Storm Uri, which Atmos passed through to the class.

   c.   Whether Defendants profiteered from Winter Storm Uri by charging unconscionable prices to Atmos, which Atmos passed through to the class.

      d.  Whether Plaintiffs must ultimately bear the cost of the natural gas for which Defendants charged unconscionable prices.

82.    Plaintiffs' claims are typical of the claims of the members of the class because their claims, and the claims of all class members, arise out of the same conduct of Defendants as alleged herein, and all members of the class are similarly affected by Defendants' wrongful conduct.

83.    Plaintiffs will fairly and adequately represent the class and have retained counsel competent in the prosecution of KCPA litigation.

84.    Plaintiffs have no interests antagonistic to those of other members of the class.

85.    Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

86.    Plaintiffs have standing to bring this action on behalf of the class because they are or during the class period were purchasers of natural gas from Defendants, through Atmos, and were injured by Defendants' unlawful conduct.

87.    Plaintiffs are entitled to receive benefits in the amount of the difference between the value of natural gas at the pre-Winter Storm Uri rate and the unconscionable prices that Defendants charged.

88.    Class action status in this action is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by the members of the class would create a risk of establishing incompatible standards of conduct for Defendants.

89.     Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the class would create a risk of adjudications with respect to individual members of the class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

90.     In the alternative, certification under Rule 23(b)(2) is warranted because Defendants acted on grounds generally applicable to the class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the class as a whole.

91.     In the alternative, certification under Rule 23(b)(3) is warranted because questions of law or fact common to members of the class predominate over any questions affecting only individual members, and class-action treatment is superior to the other available methos for the fair and efficient adjudication of this controversy.

### Claims for Relief

### Count I: Violation of the Kansas Consumer Protection Act
### K.S.A. 50-627(b)

92.     Plaintiffs incorporate the preceding allegations in this count.

93.     Plaintiffs are "consumers" within the meaning of the KCPA because they purchased natural gas for personal, family, and household use.

94.     Defendants are "suppliers" within the meaning of the KCPA because they sold natural gas in the ordinary course of business to Plaintiffs, whether or not they dealt directly with Plaintiffs.

95.     Defendants' sale of natural gas during Winter Storm Uri was a "consumer transaction" under the KCPA because Defendants sold property to Plaintiffs within Kansas.

21

96.     During Winter Storm Uri, Defendants took advantage of Plaintiffs' inability to protect its interests.

97.     Similarly, when Defendants entered spot-price transactions during Winter Storm Uri, they charged a price that grossly exceeded the price at which similar natural gas was readily obtainable in similar transactions by similar consumers.

98.     Moreover, the sales of natural gas that Defendants made during Winter Storm Uri forced Plaintiffs to enter a transaction that was excessively one-sided in favor of Defendants.

99.     As a result of Defendants' unconscionable acts and practices, Plaintiffs have suffered damages. Specifically, the damages claimed are those amounts the Court determines to be unconscionable, together with the financing costs assessed as a result of those unconscionable charges, with total damages estimated to be in excess of $100 million, and with specific amounts to be assessed to the individual Defendants based on the charges made by each Defendant to Atmos, which Atmos passed through to its residential consumers.

### Count II: Violation of the Kansas Consumer Protection Act
### K.S.A. 50-6,106 – Profiteering from a Disaster

100.    Plaintiffs incorporate the preceding allegations in this count.

101.    Natural gas is "home heating fuel," and therefore a necessary property or service for Plaintiffs during a time of a disaster.

102.    The Governor of Kansas declared a state of emergency during Winter Storm Uri.

103.    Winter Storm Uri was a severe storm, and therefore a disaster within the meaning of the KCPA, that began before the Governor of Kansas declared a state of emergency.

104.    Defendants profiteered from a disaster within the meaning of the KCPA because they unjustifiably and substantially:

22

a.  Increased the price they charged for natural gas by more than 25% than the price at which natural gas was available before the disaster;

b.  Charged prices for natural gas during the disaster that was 25% more than the price at which natural gas was readily obtainable by other consumers; and

c.  Charged unjustifiably high prices for natural gas that were not attributable to any additional costs that Defendants incurred in connection with the sale of the product or service.

105.    As a result of Defendants' illegal profiteering, Plaintiffs have suffered damages. Specifically, the damages claimed are those amounts the Court determines that Defendants profiteered, together with the financing costs assessed as a result of those unconscionable charges, with total damages estimated to be in excess of $100 million, and with specific amounts to be assessed to the individual Defendants based on the charges made by each Defendant to Atmos, which Atmos passed through to its residential consumers.

### Count III: Violation of the Kansas Consumer Protection Act
### K.S.A. 50-634(e) – Attorney Fees

106.    Under K.S.A. 50-634, the Court may award consumers reasonable attorney fees where: (1) a supplier commits an act or practice that violates the Act; (2) the prevailing party is the consumer; and (3) an action under K.S.A. 50-634 has been terminated by a judgment or settled.

107.    Defendants are suppliers under the Act.

108.    Plaintiffs are consumers under the Act.

109.    In prosecuting this action, Plaintiffs have incurred, and will continue to incur, reasonable attorney fees.

110.    Upon prevailing in this class action under K.S.A. 50-634(d), the court may award plaintiffs' reasonable attorney fees.

111.    Plaintiffs request that, upon prevailing in this action, the Court award Plaintiffs the reasonable attorney fees that they have incurred for the work their attorneys have reasonably performed.

WHEREFORE, Plaintiffs request that judgment be entered against Defendants on all claims and request that the Court award the following relief:

A.  A determination that Plaintiffs may proceed on behalf of the class;

B.  A determination that this action may proceed as a class action under Federal Rule of Civil Procedure 23(b)(1) or, in the alternative, Rule 23(b)(2) or, in the alternative, Rule 23(b)(3).

C.  Designation of Plaintiffs as class representatives and designation of Plaintiffs' counsel as class counsel;

D.  Actual damages in the amount of unconscionable costs that Defendants imposed on the class throughout Winter Storm Uri in violation of the Act;

E.  An award of pre-judgment interest;

F.  An award of costs under Federal Rule of Civil Procedure 54(d)(1);

G.  A service award to the class representatives;

H.  An award of attorney fees under K.S.A. 50-634; and

I.   Such other and further relief as the Court deems equitable and just.

## DESIGNATION OF PLACE OF TRIAL

Plaintiffs designate Wichita, Kansas, as the place of trial.

Respectfully submitted,

FOULSTON SIEFKIN, LLP


*s/Jay F. Fowler*
Jay F. Fowler, KS #10727
Samuel J. Walenz, KS #29114
1551 N. Waterfront Parkway, Suite 100
Wichita, KS 67206-4466
T: 316-291-9541|F: 316-267-6345
jfowler@foulston.com
swalenz@foulston.com

Scott C. Nehrbass, KS# 16285
Lee M. Smithyman, KS# 09391
James P. Zakoura, KS# 07644
7500 College Blvd., Suite 1400
Overland Park, KS 66210
T: 913-484-4627|F: 913-498-2101
snehrbass@foulston.com
lsmithyman@foulston.com
jzakoura@foulston.com

*Attorneys for Plaintiffs*